IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NOEL FELIX ORTEGA,

        Plaintiff,              No. CIV S-07-0915 LKK GGH P

    vs.

T. FELKER, et al.,

        Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff Noel Ortega is a state prisoner at High Desert State Prison (HDSP), within the custody of the California Department of Corrections and Rehabilitation (CDCR), who proceeds pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Presently pending before the court is defendants' summary judgment motion filed June 26, 2009, in response to which plaintiff filed an opposition, and defendants a reply.  For the following reasons, the court recommends that defendants' motion be granted.

I.  BACKGROUND

        This action is proceeding on the Amended Complaint filed June 9, 2008 (Docket No. 34), against defendants T. Felker and Clifford Smith.  Plaintiff challenges, on Eighth Amendment and Equal Protection grounds, HDSP's policy of removing plastic wrap from lunch and canteen food items before they are provided to inmates who are administratively segregated,

including in its Security Housing Unit (SHU), during the period roughly April 2006 to January 2009. For most of this period, defendant Felker was Warden at HDSP; for a year, defendant Smith was Associate Warden of Business Services.[1] Plaintiff alleges that his food is unsanitary, containing human hair, dirt, small rocks and lint, which has caused plaintiff stomach pain, vomiting, diarrhea, and emotional damages.

In his Amended Complaint ("AC"), plaintiff claims that, as a result of HDSP's policy of unwrapping the lunch and canteen items of administrative segregation inmates, plaintiff and other inmates have received unsanitary food that has rendered plaintiff and other inmates ill. Plaintiff alleges that he has found human hair and dirt in his food, and that the food also contains "bacteria causing (1) food poisoning, (2) helicobacter pylori ("H. Pylori"), (3) salmonella poisoning [or (4)] Hepatitis A&B." (Id. at 4.) As a result of eating such food, plaintiff has experienced "stomach pain and . . . [needed] to use the restroom several times a day for about a month;" that "plaintiff a few months ago had to be given a shot for he was throwing up all the water and food he would consume[.] It got [so] bad that plaintiff was having abdominal pain so severe that the pain would not let plaintiff breath. Plaintiff start[ed] to throw up little pathes [sic] of blood. Now plaintiff just had the diarrhea from 5-21-08 through 5-28-08 and have correctional officers who witnessed the diarrhea. I informed the nurse who documented it." (Id. at 3, 4.) Plaintiff alleges that he lost weight during the month he was most ill. (Id. at 5.) The Amended Complaint alleges that other inmates have been sick too, but that the "medical department covers up the cause of the problem by telling the inmates "you're just coming down with the flu." (Id. at 4.)

Plaintiff further contends that defendants "intentionally and knowingly" poison inmates by purposefully feeding them food labeled "not fit for human consumption." (AC at 4.)

---

[1] Defendant Felker served as Warden between October 2005 and October 2008 (Felker Decl. at ¶ 2); defendant Smith served as Associate Warden of Business Services between December 2006 and December 2007 (Smith Decl. at ¶ 2).

1   Plaintiff describes a process whereby "both defendants in order to save money they go out buying

2   food that is not for human consum[p]tion and feeding it to the inmates, it was told to plaintiff by

3   these inmates [with 'first hand knowledge'] that all the food first goes to "E" yard where the food

4   comes in with big lettering on the food boxes 'not for human consumption.' The inmates are

5   then told to remove the boxes out of the ones that say 'not for human consumption' into another

6   colored brown box without any lettering on it. Then from "E" yard it is sent to "A" yard kitchen

7   where it is destrubied [sic] throughout the prison." (Id.)

8           Plaintiff contends that he has a constitutional right to sanitary food, and that

9   defendants' failure to provide sanitary food constitutes cruel and unusual punishment in violation

10  of the Eighth Amendment to the United States Constitution, and denies him equal protection of

11  the laws as guaranteed by the Fourteenth Amendment.[2]

12  II. <u>MOTION FOR SUMMARY JUDGMENT</u>

13          Defendants move for summary judgment on the following grounds: (1) HDSP's

14  policy of unwrapping lunch and canteen items given to administratively segregated inmates does

15  not constitute cruel and unusual punishment because plaintiff nor any other inmate has been

16  harmed by the policy, it does not constitute a serious deprivation of constitutional rights, and it

17  was implemented for security reasons rather than pursuant to a culpable state of mind; (2) the

18  policy does not violate equal protection because it does not implicate a suspect classification or

19  fundamental right and, pursuant to a rational basis analysis, is rationally related to a legitimate

20  penological interest; and (3) defendants are entitled to qualified immunity.

21  \\\\\

22

23          [2] Plaintiff also contends that, as a result of speaking out and filing grievances about this
    issue, he and other administratively segregated inmates ("political prisoners") are being retaliated
24  against "with less exercise yard time; less sanitary supplies or none at all; less clothing; being
    given non-exercise shoes with no shoe soles on the inside; being denied proper clothing for the
25  winter/snow weather." (Docket No. 34, at 5.) However, this newly presented claim of
    retaliation for exercising First Amendment rights is appropriately brought in a new civil action
26  after plaintiff has exhausted his administrative remedies.

III.  LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

4

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

\\\\\

1    On July 31, 2007, the court advised plaintiff of the requirements for opposing a

2  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

3  F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v.

4  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

5  IV.  FACTS

6    The following facts are undisputed unless otherwise noted.[3]  Plaintiff arrived at

7  HDSP on September 21, 2004.  (Hanlon Decl., Exh. A, at 2.).  On April 27, 2006, Ortega and

8  another inmate were charged with attempted murder for using homemade weapons to stab a third

9  inmate. (Id., Exh. B; Ortega Dep. at 88:12- 92:8.)  Investigation of the crime scene revealed two

10  weapons made from melted plastic.  (Id., Exh. B at 5.)  The first weapon "was approximately

11  6½" in length and ½" wide, it appeared to be made from melted plastic with a metal nail shaped

12  tip which was about 1½" in length."  (Id.)  The second weapon "measured 6" long and 3/4" wide

13  and appeared to be melted white and black plastic to form a handle with a metal sharpened tip on

14  one end."  (Id.)  On the same date, April 27, 2006, pending further investigation of the incident,

15  Ortega was placed in administrative segregation, when he began receiving his lunch and canteen

16  food without wrappings. (Id., Exh. D; Ortega Deposition (Defendants' Exhibit H), at 92:9 to

17  93:21.)  A disciplinary hearing was held on May 12, 2006.  (Hanlon Decl., Exh. B, at 4-6.)

18  Plaintiff was found guilty of attempted murder, assessed 360 days of credit loss, and referred to

19  the Institutional Classification Committee for assessment of a 26-month SHU term.  (Id. at 6;

20  Ortega Dep. at 91:20 to 92:1-8.)

21    Although plaintiff was temporarily transferred to another institution (Tehachapi)

22  on August 10, 2006, he was returned and has remained at HDSP since November 21, 2006.

23  (Hanlon Decl., Exh. A, Ortega Dep.12: 11-19).  Between November 21, 2006 and January 2009,

24

25    [3] Defendants filed a statement of undisputed facts.  (Docket No. 48-3.)  Plaintiff has not
expressly disputed any fact submitted by defendants.  He has, however, submitted his own
26  affidavit and the affidavits of several fellow prisoners.  (Docket No. 50.)

1   Ortega spent most of his time at HDSP in administrative segregation.  After completing his

2   disciplinary housing term for the attempted murder charge, Ortega was returned to administrative

3   segregation for indecent exposure, then again for safety concerns.  (Ortega Dep. at 8:1-3, 20-25,

4   9:1-25, 10:1-25, 11:1-21 .)

5          Plaintiff testified in deposition on January 13, 2009, that until October 2008, he

6   routinely received his lunch and canteen food unwrapped while in administrative segregation, but

7   wrapped when he was in the general population.  (Ortega Dep. at 8:4-6, 11:19-25. 12:1-10; 13-

8   16.)  Plaintiff stated that, although he had then been in administrative segregation since October

9   2008, his food was now being served wrapped except for the first week of his placement.

10  Plaintiff did not know why the change was made.  (Id. at 10:14, 11:17-25, 12:1-10, 66:2-68:17.)

11  Consistently, in his affidavit filed in opposition to defendants' motion for summary judgment,

12  plaintiff states that he is "currently in administrative segregation for possession of a weapon and I

13  am still receiving my lunch items still in their factory sealed wrappings."  (Docket No. 50, at p.

14  19.)

15         Defendants describe the challenged policy as follows.  Inmates at HDSP receive

16  three meals a day – hot breakfast, sack lunch, hot dinner – plus canteen food items.  (Cummings

17  Decl., ¶ 6.)  Inmates in administrative segregation receive the same food, prepared in the same

18  kitchen, as that provided to general population inmates.  (Smith Decl., ¶¶ 4, 5.)  Correctional

19  staff deliver meals to administratively segregated inmates, who are not permitted to leave their

20  cells at meal time.  (Id. at ¶ 6.)  Breakfast and dinner (meals served hot) are served on steam-

21  heated plastic trays, without plastic wrapping; the trays are returned after the inmates have eaten.

22  (Id. at ¶¶ 7, 8, 9.)  Administratively segregated inmates receive a sack lunch when their breakfast

23  is served, consisting of "one packet of lunch meat, mustard, four slices of wheat bread, a snack

24  item (such as tortilla chips or almonds), cookies, and a beverage."  (Id. at ¶ 11.)  Administratively

25  segregated inmates can also purchase canteen items, which are delivered by staff.  (Id. at ¶¶ 12,

26  13.)  It is the policy of HDSP to remove any plastic wrap from lunch and canteen food items

before serving the items to administratively segregated inmates.  (Felker Decl. ¶3; Cummings

Decl. ¶¶ 9, 10; Smith Decl. ¶ 15; Ortega Dep. 14:19-23, 17:24 to 18:20; Defendants' Exh. F

(policy regarding unwrapping canteen items)).

HDSP implemented this policy because plastic wrap can be used to fashion

weapons, and administratively segregated inmates have demonstrated a higher likelihood of

creating such weapons.  Correctional Officer R. Quezada, who works as an Investigative Services

Unit Evidence Officer responsible for preserving and maintaining weapons and other evidence

taken from HDSP crime scenes, states that forty percent of the weapons found at HDSP are made

from melted plastic.  (Quezada Decl. ¶¶ 1-5.)  Cellophane food wrapping and plastic containers

can be used to make such weapons, by "melt[ing] the plastic by heating it next to a metal object

plugged into an electrical outlet."  (Id. at ¶¶ 6, 7.)  Melted plastic can be shaped into weapon

handles and points.  (Id. at ¶ 8; Defendants' Exhibit G (pictures of weapons fashioned from

melted plastic wrappings).)  The policy of removing plastic wrap from food served to

administratively segregated inmates was implemented because "HDSP's administrative

segregation unit included several inmates who had been accused of possessing or using

homemade weapons in assaults of other inmates or prison staff," and "administrative segregation

inmates . . . have shown a much higher likelihood to create homemade weapons from ordinary

materials, such as plastic wrappings."  (Felker Decl. ¶¶ 5, 8.)  In addition, "[i]nmates have also

used the plastic wrapping from lunch and canteen items to conceal notes or contraband, such as

narcotics, by inserting the wrapped item into their rectum."  (Quezada Decl. at ¶ 9.)

The challenged policy requires that prison staff responsible for unwrapping lunch

and canteen food items take precautions to ensure that the food remains sanitary and fresh,

including wearing sterile gloves while unwrapping and handling the food, then placing the

unwrapped food in paper bags and paper cups with lids, all within the presence of each inmate.

(Felker Decl. ¶¶ 9-12; see also Defendants' Exh. F (canteen items).)  In addition, "[a]t each meal,

HDSP dining staff prepare[] an unused tray of food for the purpose of testing should there be an

inmate complaint of any food-borne illness." (Id. at ¶ 13.)

Plaintiff testified that while he was in administrative segregation, prison staff did not unwrap plaintiff's food in his presence. (Ortega Dep. at 14:24 to 15:5.) Plaintiff testified that once or twice a week he would find hair, a small rock, dirt or lint in his unwrapped food, although sometimes he wouldn't find any foreign matter for as long as a week. (Ortega Dep. 23:5-11, 24:16 to 25:6, 69:22 to 70:3.) Occasionally, plaintiff would find a hair on his breakfast but it did not make him sick. (Id. at 72:18 to 73:2.)

Plaintiff testified that he first experienced persistent diarrhea and vomiting, without fever, in November-December 2006, for about a month, after his return from Tehachapi. (Id. at 31:13 to 34:7; 87:23 to 88:6.) Thereafter, the vomiting ceased, but plaintiff had diarrhea once or twice a month, off and on. (Id. at 34:8-20.)[4] Plaintiff saw a doctor in 2007 for stomach pains, was diagnosed with gas or the flu, and prescribed Metamucil. (Id. at 36:14 to 38:19.) Plaintiff was given a shot sometime between June and September 2007, to stop him from throwing up; he stopped throwing up by the next day. (Id. at 39:1 to 40:25; 46:13-16; 85:8-19.) At the end of 2008, plaintiff was seen by Dr. Medina for vomiting and constipation. (Id. at 46:17 to 47:3.) At the time, though in administrative segregation, plaintiff was receiving his food wrapped. (Id. at 35:4-6, 47:4- 9.) Plaintiff was prescribed fiber tabs. (Id. at 47:21-25:4.) Plaintiff testified that he has had trouble with constipation since early 2008. (Id. at 48:7 to 49:18.) Plaintiff has also had stomach acid problems as a result of eating unwrapped food, for

_____

[4] Plaintiff also alleged a further bout of vomiting, while he was in the general population, but due to another cause (alleged intentional poisoning), a claim that is not presented in this case. (Ortega Dep. at 34:21 to 36:13, 74:5 to 78:18 (plaintiff became ill in June 2008 after eating a dinner in which Officer Cook added a white substance).) Also not before this court are plaintiff's allegations against Officers Cook, Hubbard and Flores, who served unwrapped food to plaintiff, and may have a motive to poison plaintiff. (Id. at 62:17 to 65:5.) Plaintiff pursues in another action his claim that he has been shorted food at breakfast and dinner. (See, e.g., id. at 24:1-15; 50:6 to 51:12.) Although plaintiff testified in deposition that he was sometimes shorted lunch and canteen food items due to the process of unwrapping (id. at 50:22 to 51:12), this issue is not currently before the court. Also not before the court is the fact that plaintiff chipped or cracked a decaying wisdom tooth on a small rock while eating unwrapped food; however, the tooth was repaired and plaintiff did not file a grievance on this matter. (Id. at 21:17 to 22:18.)

which Dr. Medina prescribed medication at the end of 2008.  This medication and the fiber tabs have been helpful.  (Id. at 51:13 to 53:25; 80:15 to 84:6.)

Plaintiff testified that he was never diagnosed with food poisoning or told that his health problems were caused by eating unwrapped food items, except that the nurse who gave him the shot said that "a lot of inmates were getting sick from the lunches," and "that it's possible" this is why plaintiff got sick.  (Oretega Dep. at 43:20 to 44:3; 49:19-25 to 50:1; 84:10 to 85:10; see also, Defendants' Undisputed Fact ("DUF") No. 43; and Decl. of J. Nepomuceno, M.D., at ¶¶ 14-16.)  Plaintiff testified that other inmates also experienced vomiting and diarrhea when they ate unwrapped lunch items, but he was unable to provide their names.  (Ortega Dep. at 44:4 to 46:12; 50:2-5.)  Plaintiff testified that he did not experience health problems when he refrained from eating his lunch, and he now ate his lunch only one to three times a month.  (Ortega Dep. at 41:15 to 43:16, 70:4-20.)

Nor was plaintiff told that his symptoms were caused by the bacteria Helicobacter pylori ("H. pylori").  (Ortega Dep. at 38:3-7.)[5]  However, in his opposition to the instant motion plaintiff attached a December 5, 2008 lab report indicating that he tested positive for the bacteria.  (Docket No. 50, at 21.)[6]  As noted below, plaintiff received treatment for H. pylori in March

---

[5]  Plaintiff initially responded "what's that?" to defendants' deposition question whether plaintiff had been diagnosed with H. pylori.  (Ortega Dep. at 38:3-7.)

[6]  The following information is taken from the website of the esteemed Mayo Clinic.  The court takes judicial notice of these facts in support of its finding that material facts remain disputed in this case, rather than to demonstrate the truth of any alleged fact.  (See Fed. R. Evid. 201 (court may take judicial notice of facts that are capable of accurate determination by sources whose accuracy cannot reasonably be questioned); but see, M/V American Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983) (a court may not take judicial notice of facts essential to support a contention in a case before it without formal introduction of evidence):

Most cases of H. pylori infection produce no signs or symptoms.  Signs or symptoms that can occur with H. pylori infection include:  An ache or burning pain in your abdomen, Nausea, Vomiting, Frequent burping, Bloating, Weight loss.

H. pylori infection is caused by the H. pylori bacterium. H. pylori is primarily

2009.  (Nepomuceno Decl. ¶13.')

Plaintiff is 5'6" tall.  He testified that he weighed about 170 pounds in November 2006, that his lowest weight was 148 pounds around the end of 2007 or beginning of 2008, but that it has since climbed to 150 to 155 pounds.  (Id. at 78:19 to 80:14.)

Plaintiff testified that while he believed prison officials were intentionally trying to poison him (see n. 4, supra), he knew of no personal animus against him by defendants Felker or Smith.  (Ortega Dep. at 61:24 to 62:16, 64:8-11, 87:9-22; see also, DUF No. 40.)  Plaintiff also testified that the allegations of his complaint concerning the processing of food in HDSP's "E" yard were based on the reports of two inmates whose names he did not remember, and that plaintiff did not himself ever see a box that said "Not for Human Consumption."  (Ortega Dep. at 85:22 to 87:8.)

Plaintiff's medical records from HDSP are set forth in Defendants' Exhibit E, authenticated by Health Records Supervisor D. Christie (Christie Decl.), and reviewed by Chief Physician Surgeon at HDSP, J. Nepomuceno, M.D. (Nepomuceno Decl.), who began working at HDSP in May 2008 (id. at ¶ 18).  As set forth in defendants' undisputed facts (uncontested by plaintiff), Dr. Nepomuceno made the following observations and assessments in his declaration signed June 25, 2009:

> As Chief Physician Surgeon at HDSP, J. Nepomuceno, M.D., has not seen any cases of food poisoning caused by individuals eating food with dirt or hair on it. (Nepomuceno Decl. ¶ 8.)  Defendants' Undisputed Fact ("DUF") No. 46.
>
> Food poisoning often results from the improper cultivation, storage, or handling

---

passed from person to person through direct contact with saliva or fecal matter. H. pylori can also be spread through untreated water.  [¶ ] H. pylori bacteria enter your body through your mouth and passes into your digestive system.  The stomach and its stomach acid make a hostile environment for many bacteria.  But the H. pylori bacterium is especially well-adapted for survival in the stomach.  It produces an enzyme that, through a series of biochemical processes, creates a low-acid buffer zone for itself.

Source: http://www.mayoclinic.com/health/h-pylori/DS00958/DSECTION =symptoms,  and DSECTION=causes.

of foods, resulting in the development of bacteria, such as e. coli or salmonella. (Nepomuceno Decl. ¶ 6.)  DUF No. 41.

Patients suffering from food poisoning may have any of the following symptoms: nausea, vomiting with diarrhea, stomach cramping, fever, and body aches. (Nepomuceno Decl. ¶ 7.)  DUF No. 42.

If the consumption of unwrapped lunch and canteen items resulted in food poisoning, other inmates within HDSP's administrative segregation unit would have reported symptoms consistent with food poisoning at the same time. (Nepomuceno Decl. ¶ 17.)  DUF No. 47.

Dr. Nepomuceno has not seen or heard of any increase [as compared to what] in the reporting of food poisoning symptoms by administrative segregation inmates. (Nepomuceno Decl. ¶ 18.)  DUF No. 48.

Ortega's medical entries state that he suffered from ongoing bouts of vomiting without diarrhea between December 2007 and April 2009, and constipation in November 2008.  These conditions are not normally seen with food poisoning, but could indicate a problem with Ortega's gall bladder, liver, heartburn, or other causes.  (Nepomuceno Decl. ¶¶ 11-12, Ex. E.)  DUF No. 45.

Ortega's medical file does not indicate symptoms consistent with food poisoning. (Nepomuceno Decl. ¶¶ 9-12; Ex. E.)  DUF No. 44.

Ortega has not received any medical diagnosis stating that his stomach ailments were caused by eating unwrapped food items.  (Ortega Dep. 49: 19-25, 50: 1; Nepomuceno Decl. ¶¶ 14-16; Christie Decl. Ex. E.).  DUF No. 43.

In addition, Dr. Nepomuceno has observed that:

Ortego's medical records . . . show that he received treatment for Helicobacter pylori (H pylori) bacteria in March 2009.  Nepomuceno Decl. ¶13.

The source of the H pylori bacteria in Ortega's case is unknown.  I do not know of any cases in which individuals contracted H pylori by eating foods removed from their packaging.  I am aware of no basis to infer that Ortega contracted H pylori in this way.  Nepomuceno Decl. ¶ 14.

Since I began working at HDSP in May 2008, I have not seen an increase in the reporting of food poisoning symptoms by administrative segregation inmates.  Also, I have not heard of any problems with food poisoning occurring among administrative segregation inmates before my tenure at HDSP.  Nepomuceno Decl. ¶ 18.

Plaintiff has submitted the affidavits of seven inmates who concur that their unwrapped lunch and canteen food items have sometimes contained hair, dirt, small rocks or lint.  Significantly, none of these inmates assert that they have personally experienced or witnessed

any illness associated with the HDSP's no-wrap policy.[7]  An additional statement was made by

[7] Plaintiff has submitted affidavits from the following inmates: (1) Nick Sanchez, signed August 18, 2007 (recounting personal experience with no-wrap policy while in HDSP's solitary confinement, as compared to the wrap-policy in HDSP's general population, finding in his lunch and canteen items "some one elses hair . . . and or lent and at time dirt/sand rocks" (Docket No. 50, at 25); (2) Paul Salas, signed August 18, 2007 (describing personal experience with no-wrap policy while in HDSP's solitary confinement, as compared to the wrap-policy in HDSP's general population, finding in his lunch and canteen/store items "some one elses hair . . . and or lent and at times dirt/sand rocks" (Docket No. 50, at 265); (3) Fernando Garcia, signed August 20, 2007 (recounting personal experience with no-wrap policy while in solitary confinement, as compared to wrap-policy applied to solitary confinement at Sierra Conservation Center, finding in his unwrapped lunch  and canteen items "human hair and dirt" (Docket No. 50, at 28); (4) Jonathan Raridon, signed August 17, 2007 (recounting personal experience with no-wrap policy while in HDSP's solitary confinement, as compared to the wrap-policy in HDSP's general population, finding in his lunch and canteen/store items "some one else' s hair . . . and/or lent and at times dirt/sand rocks" (Docket No. 50, at 30); (5) Rex Chappell, signed August 9, 2007, describes food service to inmates in administrative segregation as follows:

> [T]he meal's served in administrative segregation are not very sanitary.  First and foremost none of the officer's feel they have to wear anything on their head's when administering to or serving the meal's, and if we push the issue, they will short out the meal even more and or won't feed you at all for insisting on head gear. [¶] The tray's that we receive our meal on often have food plastered to them from the meal the night before, which evidences that they aren't being properly cleaned.  Lunches are alway's scarey, because they take everything out of it's original wrappings, which is an unnecessary function and policy, serve's absolutely no purpose, "except," to punish or degrade.  But even more importantly it's done to desanitize that meal. . . . Potato chip's are taken from it's original bag that's designed to keep them fresh and sanitary.  The same with cookies & nut's.

(Docket No. 50, at 32); (6) Joseph Colaneri, signed June 26, 2008, describes personal challenges with the no-wrap policy in HDSP's administrative segregation, as compared to the wrap-policy applied to the prison's general population :

> The High Desert State Prison, Ad. Seg. Unit, routinely on a daily basis removes food from its wrappers so that two hours later, inmates refer to it (especially bread) as it is toast and very difficult to swallow due to its hardness. . . . Also, another problem arises in my having no upper back teeth to chew stale bread. [¶ ] The other policy here in Ad. Seg. is that all canteen wrappers are discarded putting food items in paper bags, removing the flavor, and causing staleness within days. Even the correctional [officers] comment on the absurdity of an $45.00 order having to be consumed within days of it's arrival.

(Docket No. 50, at 33); (7) Victor Monterosso, dated June 29, 2008, also describes in more detail the impact of the challenged policy:

> The High Desert State Prison Ad. Seg. Unit on a everyday basis has decided to remove food from its wrappers wich thru experience has left me with food unsuitable for consumption because the meat [is the] texture of beef jerky – the

13

1   HDSP inmate Edward Thomas in a non-verified letter to the court.  (Docket No. 35).  While not

2   attested under penalty of perjury, Thomas describes the presence of hair, lint and dirt in his food,

3   and states that "[t]he lunch meat has green, and brownish-black spot's on it at time[s]."  (Id. at 1.)

4   Thomas states that he has become sick three times while in administrative segregation, with

5   stomach pains and diarrhea, and that the correctional officers serving the food "do not wear head

6   covers hats fully enclosing there hair" [sic].  (Id.)

7            While Warden at HDSP, between October 2005 and October 2008, Felker was not

8   aware of any foodborne illnesses resulting from the food tests or otherwise suffered by HDSP

9   inmates. (Felker Decl. ¶¶ 14, 2.)   The no-wrap policy was in effect during the tenures of both

10  Felker and Smith.  (Id., ¶ 3; Smith Decl. ¶ 16.)

11  V.  DISCUSSION

12           The analysis of defendants' motion for summary judgment on plaintiff's Eighth

13  and Fourteenth Amendment claims requires a prefatory review of the contentions and evidence

14  before the court.  Plaintiff contends that HDSP's policy of requiring the removal of plastic wrap

15  from the lunch and canteen food items served administrative segregation inmates renders the

16  food unsanitary, which has caused plaintiff to become ill.  While plaintiff has focused on the

17  foreign matter found in his unwrapped food, his Amended Complaint broadly alleges that the

18  culprit is "bacteria," including that with which plaintiff has been diagnosed, H. pylori.  (AC at 4.)

19  ————————————————

20           bread is so hard it's either into bread crumbs leaving you with a very unpleasant
             sandwich that would not be eating by regular citizens and shouldn't be eaten by us
21           . . . . [Now] to issue of "canteen" it is beyond comprehension how a individual is
             to consumer 45.00 dollars worth of food in days.  Within four days food has gone
22           completely stale wich could lead to getting sick.  Know they need to explore other
             methods of getting handling the Ad-Seg food situation.  One suggestion would be
23           to number the amount of bags you get and then if you do not return that amount,
             you could be held responsible . . .
24
     (Docket No. 50, at 34-35.)
25
             Each of these inmates, with the exception of Monterroso, assert that the challenged policy
26   is not made for security reasons, but to punish inmates in solitary confinement.

1    Defendants have selectively responded with the unrebutted medical assessment of

2    Dr. Nepomuceno that plaintiff's symptoms are inconsistent with eating unwrapped food per se,

3    or an occasional stray hair or dirt; moreover, that plaintiff's symptoms of "vomiting without

4    diarrhea" and constipation are inconsistent with food poisoning.  (Nepomuceno Decl. ¶¶ 16, 17,

5    11, 12.)[8]  While Dr. Nepomuceno acknowledges, without a discussion of symptoms, that plaintiff

6    was treated for the H. pyloria bacteria, he concludes that "[t]he source . . . is unknown," and that

7    he is "aware of no basis to infer that Oretega contracted H. pylori" "by eating foods removed

8    from their packaging."  (Nepomuceno Decl. ¶¶ 13, 14).  Dr. Nepomuceno concludes that he is

9    unaware of "any problems of food poisoning symptoms by administrative segregation inmates,"

10    either before or during his tenure (id. at ¶¶ 17, 18), consistent with defendant Felker's

11    observation that during his tenure he "did not know of any food-borne illnesses resulting from []

12    food tests or otherwise suffered by the inmates at HDSP" (Felker Decl. ¶¶ 14, 2).

13    Defendants do not address the possibility that plaintiff's symptoms may be

14    consistent with contracting H. pylori bacteria (see n. 6, supra),[9] or the extent to which this

15    bacteria appears in HDSP's general and administrative segregation inmate populations.  Since H.

16    pylori can be transferred through direct contact with contaminated saliva or fecal matter, and

17    enters the body through the mouth (see id.), it is possible that prison staff responsible for

18    implementing the challenged policy failed to adhere to sanitation protocols, e.g., wearing plastic

19    gloves.  Thus, the possibility of bacterial food contamination appears squarely at issue and

20    unresolved, underscored by the parties' material dispute whether staff unwrap the food of

21    administrative segregation inmates within view of each inmate.  (Cf., Felker Decl. at ¶ 12, and

22    _____

23    [8] Dr. Nepomuceno fails to address the period November to December 2006, when
     plaintiff's symptoms may have been consistent with food poisoning, as described by Dr.
24    Nepomuceno himself ("nausea, vomiting with diarrhea, stomach cramping, fever, and body
     aches").  (Id. at ¶¶ 7, 11, 12.)

25    [9] Although plaintiff was diagnosed with H. pylori only in December 2008, it does not
     appear from his prison medical record (Defendants' Exhibit E) that he was previously tested for
26    it.

1   Ortega Dep. at 14:24 to 15:5.)

2          With these considerations in mind, the court addresses defendants' motion for

3   summary judgment on plaintiff's Eighth and Fourteenth Amendment claims.

4          A.  EIGHTH AMENDMENT

5          "[A] prison official cannot be found liable under the Eighth Amendment for

6   denying an inmate humane conditions of confinement unless the official knows of and disregards

7   an excessive risk to inmate health or safety; the official must both be aware of facts from which

8   the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

9   the inference."  Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970 [] (1994).  "Prison

10  officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing,

11  sanitation, medical care, and personal safety."  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.

12  2000), citing, inter alia, Farmer v. Brennan, 511 U.S. at 832; see also, Hoptowit v. Ray, 682 F.2d

13  1237, 1246 (9th Cir. 1982) ("an institution's obligation under the eighth amendment is at an end

14  if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care,

15  and personal safety" [internal quotations omitted] ).  When an inmate has been deprived of

16  necessities, "the circumstances, nature and duration of a deprivation ... must be considered in

17  determining whether a constitutional violation has occurred."  Johnson, supra, at 731.

18          "[T]he State must provide an inmate with a 'healthy habilitative environment[,]'

19  [that] includes providing nutritionally adequate food that is prepared and served under conditions

20  which do not present an immediate danger to the health and well being of the inmates who

21  consume it."  Ramos v. Lamm, 639 F.2d 559, 570- 71 (10th Cir.1980).  While " 'a lack of

22  sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of

23  the Eighth Amendment,' "  Johnson, supra, at 731, quoting Anderson v. County of Kern, 45 F.3d

24  1310, 1314, as amended, 75 F.3d 448 (9th Cir.1995), "[t]he Eighth Amendment requires only

25  that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically

26  pleasing.  Cunningham v. Jones, 567 F.2d 653, 659-60 (6th Cir.1977).  'The fact that the food

occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not

amount to a constitutional deprivation.' Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th

Cir.1985), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492 [] (1986)," LeMaire v. Maass, 12 F.3d

1444, 1456 (9th Cir. 1993).  Accord, Drake v. Velasco, 207 F. Supp. 2d 809 (N.D. Ill. 2002)

(food that occasionally contains foreign objects or is sometimes served cold does not constitute a

constitutional deprivation); Miles v. Konvalenka, 791 F. Supp. 212 (N.D. Ill. 1992) (single

instance of finding mouse in food not actionable); Lunsford v. Reynolds, 376 F. Supp. 526 (W.D.

Va. 1974) (occasional foreign objects in prison food does not present a constitutional question);

see also, George v. King, 837 F.2d 705, 707 (5th Cir.1988) ("a single incident of unintended food

poisoning, whether suffered by one or many prisoners at an institution, does not constitute a

violation of the constitutional rights of the affected prisoners"); Islam v. Jackson, 782 F. Supp.

1111, 1114-15 (E.D. Virginia 1992) (serving one meal contaminated with maggots, and meals

under unsanitary conditions for thirteen days, did not constitute cruel and unusual punishment

even though inmate suffered symptoms of food poisoning on one occasion).

"[T]here are two parts to the test of whether an alleged deprivation is cruel and

unusual punishment.  The first part of the test is objective:  Was the deprivation sufficiently

serious?  The second part is subjective:  Did the officials act with a sufficiently culpable state of

mind?"  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993), citing Wilson v. Seiter, 501 U.S.

294, 299-300 (1991).  "As such, to be actionable under the Eighth Amendment, these

deprivations must satisfy not only the objective component of the relevant test, i.e., was the

deprivation sufficiently serious, but also the subjective component, i.e., was the offending

conduct *wanton*."  Id.  "The second part of the test, as we have indicated, mandates an

examination of the state of mind of the person imposing the deprivation, and that part of the test

is not satisfied unless the pain which has been inflicted is both 'unnecessary and wanton.'" Id.,

quoting Jordan v. Gardner, 986 F.2d 1521, 1525 (9th Cir.1993) (en banc).

\\\\\

1    Insufficient information besets both parts of the test.  Plaintiff's allegations

2 concerning the presence, without more, of visible foreign matter in his food fail objectively to

3 demonstrate a "sufficiently serious deprivation" to invoke constitutional protection.  See Wilson

4 v. Seiter, supra, 501 U.S. at 299-300, citing Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392

5 (1981); Farmer v. Brennan, supra, 511 U.S. at 834.  As the cases cited above demonstrate, the

6 occasional presence of hair, lint, a small rock or dirt in plaintiff's unwrapped food (once, twice or

7 not at all in a given week) is not, in itself, a constitutional violation.  The same cases support the

8 conclusion that a single incident of food poisoning is not sufficiently serious to constitute a

9 constitutional violation.

10    The second prong is equally problematic.  "The second requirement follows from

11 the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth

12 Amendment.'  To violate the Cruel and Unusual Punishments Clause, a prison official must have

13 a 'sufficiently culpable state of mind.'"  Farmer v. Brennan, supra, 511 U.S. at 834, quoting

14 Wilson, 501 U.S. at 297 (internal quotation marks, emphasis, and citations omitted).  "[I]t is

15 enough that the official acted or failed to act despite his knowledge of a substantial risk of serious

16 harm. . . .Whether a prison official had the requisite knowledge of a substantial risk is a question

17 of fact subject to demonstration in the usual ways, including inference from circumstantial

18 evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from

19 the very fact that the risk was obvious."  Farmer, supra, 511 U.S. at 842.

20    Absent evidence that defendants ignored the presence of illness, or a substantial

21 risk of illness, in the administrative segregation population that could be associated with the

22 challenged policy, neither the policy nor any resulting illness would demonstrate the requisite

23 culpable state of mind.  As designed, the challenged policy required adherence to sanitation

24 protocols intended to minimize the risk of illness, and the current record supports the inference

25 that defendants were unaware of any instances of "food-borne illnesses" during their tenure.

26 \\\\\

All of plaintiff's evidence amounts to total speculation.  If permitted to have a trial, plaintiff would testify and present evidence to the effect of – I have stomach problems and got sick over an extended period – it must be the unwrapped food.  While this is always a possibility, the trier of fact would have to simply speculate that the cause of plaintiff's problems was the unwrapped food as opposed to plaintiff's own unsanitary habits,  an unsanitary cell, the cold lunch as opposed to the hot dinner, contact with unsanitary persons who had nothing to do with food service, chronic stomach problems which have nothing or little to do with food, and the like.  Plaintiff's suppositions which he uses to oppose summary judgment are entirely based on his own uninformed speculation.  Plaintiff would also have to show that prison officials knew that unwrapped, unsanitary food was being served which caused the very problems experienced by plaintiff.  Plaintiff's attempt to bootstrap his speculative pronouncements to the defendants' state of mind is not sustainable.

Speculative testimony in affidavits will not defeat summary judgment.  Clouthier v. County of Contra Costa, 591 F.3d 1232, 1252 (9th Cir. 2010) citing Soremeken v. Thrifty Payless, Inc, 509 F.3d 978, 984 (9th Cir. 2007).  An issue of fact sufficient to defeat summary judgment must be something more than an ever present latent possibility.  Plaintiff must demonstrate that issues of fact remain which, if believed, would enable a jury to find for plaintiff. This is simply an impossibility based on the summary judgment record.  Defendants should be awarded summary judgment on the Eighth Amendment claim.

Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's Eighth Amendment claim be granted.

B.  EQUAL PROTECTION

Perhaps forgetting that the court previously dismissed plaintiff's facial Equal Protection Clause challenge, but perhaps because in his amended complaint plaintiff simply reiterated a facial challenge to the policy of serving unwrapped food in administrative segregation, defendants generally sought judgment on an equal protection claim.  As this court

19

previously noted (Docket No. 31, at 3), the "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985). In addressing an equal protection claim, the court must first decide the applicable level of scrutiny. The strict scrutiny standard applies only if the at-issue policy discriminates against a suspect class or infringes upon a fundamental right. Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326 (1992). In all other circumstances, a rational basis test applies. "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627 (1996).

Prisoners are not a suspect class. Glauner v. Miller, 184 F.3d 1053, 1054 (9th Cir. 1999). While prisoners have an Eighth Amendment right to receive food that is adequate to maintain health, LeMaire v. Maass, supra, 12 F.3d at 1456, they do not have a constitutional right to wrapped food. This distinction led the court previously to dismiss without leave to amend plaintiff's facial challenge to HDSP's no-wrap policy, but to dismiss with leave to amend plaintiff's as-applied challenge to the policy. Since plaintiff again makes both claims, the court addresses both, as their distinction is determinative.

## 1. FACIAL CHALLENGE

In what is particularly anomalous, plaintiff challenges a policy designed to deter the making of weapons from melted plastic wrap, when he himself was found administratively guilty of attempted murder in fashioning such a plasticised weapon. In findings and recommendations filed April 16, 2008 (Docket No. 31), adopted by the district judge on August 8, 2008 (Docket No. 40), this court dismissed without leave to amend plaintiff's facial equal protection challenge to HDSP's disparate food-wrap policies between inmates who are administratively segregated and inmates in the general population. Noting both that prisoners are

1   not a suspect class, and do not have a constitutional right to wrapped food, the court evaluated

2   plaintiff's facial challenge under the rational basis test.  "[T]he Fourteenth Amendment permits

3   the States a wide scope of discretion in enacting laws which affect some groups of citizens

4   differently than others.  The constitutional safeguard is offended only if the classification rests on

5   grounds wholly irrelevant to the achievement of the State's objective.  State legislatures are

6   presumed to have acted within their constitutional power despite the fact that, in practice, their

7   laws result in some inequality.  A statutory discrimination will not be set aside if any state of

8   facts reasonably may be conceived to justify it."  McGowan v. State of Maryland, 366 U.S. 420,

9   425-426, 81 S. Ct. 1101, 1105 (1961).  "[W]here individuals in the group affected by a law have

10  distinguishing characteristics relevant to interests the State has the authority to implement . . . the

11  Equal Protection Clause requires only a rational means to serve a legitimate end."  City of

12  Cleburne, supra, 473 U.S. at 441-442.

13         Accordingly, the court reasoned:

14         Prison security is a legitimate penological interest and inmates in the SHU are
           there for disciplinary reasons.  These two facts . . . demonstrate a rational
15         relationship between the disparity of treatment between inmates in the general
           population and the SHU regarding wrapped food and the legitimate penological
16         interest of prison security.

17  (Order & Findings and Recommendations filed April 16, 2008, Docket No. 31, at p. 4.)

18         Plaintiff again claims that security needs do not justify the challenged policy,

19  based on the repeated argument that general population inmates also fashion weapons, and the

20  new argument that the policy is not applied to administratively segregated inmates in other

21  prisons.  (Amended Complaint, Docket No. 34, at 5.)  Plaintiff presents no basis for revisiting the

22  court's prior analysis.  The heightened security needs associated with administratively

23  segregating inmates within HDSP provide a reasonable basis for the policy within that

24  institution.  That a similar policy was not in place during plaintiff's incarceration at California

25  \\\\\

26  \\\\\

1  Correctional Institution, Tehachapi (another high security prison),[10] is irrelevant.  See, e.g.,

2  Meachum v. Fano  427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (it is not constitutionally

3  significant that "life in one prison is much more disagreeable than in another").  The policy is

4  reasonably (and statistically) related to the heightened security precautions taken within HDSP,

5  and therefore passes a facial challenge under the Equal Protection Clause.

6              2.  AS APPLIED CHALLENGE

7              " '[A] rule . . . may be held constitutionally invalid as applied when it operates to

8  deprive an individual of a protected right although its general validity as a measure enacted in the

9  legitimate exercise of state power is beyond question.' " Little v. Streater, 452 U.S. 1, 16, 101

10  S.Ct. 2202, 2210-2211 (1981), quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780,

11  786 (1971).  Thus, an "as applied" plaintiff must show that his individual circumstances make

12  the general application of the law unconstitutional.  See Doe v. United States, 419 F.3d 1056,

13  1063 (9th Cir. 2005).  Plaintiff has neither pled nor demonstrated any particular, individualized

14  circumstances.

15              As such, plaintiff's present as applied  "equal protection" claim is merely a mirror

16  image of his previous facial challenge and the Eighth Amendment claim – nothing unique is

17  presented.  Defendant's motion as to the as applied Equal Protection Clause should be granted.

18  Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's as-

19  applied Equal Protection claim be granted.

20      C.  QUALIFIED IMMUNITY

21              Defendants contend that they are entitled to qualified immunity on plaintiff's

22  Eighth and Fourteenth Amendment claims because defendants are not liable for any

23  constitutional violation or, alternatively, because defendants did not violate any clearly

24  established law by implementing the challenged policy.

25  _____

26  [10]  The only other institution referenced in the affidavits submitted by plaintiff's fellow inmates is Sierra Conservation Center, which is not a high security facility.

1            " 'The doctrine of qualified immunity protects government officials from liability

2  for civil damages insofar as their conduct does not violate clearly established statutory or

3  constitutional rights of which a reasonable person would have known.' Pearson v. Callahan, ---

4  U.S. ----, 129 S.Ct. 808, 815 [] (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102

5  S.Ct. 2727 [] (1982) (internal quotation marks omitted)).  In considering a claim of qualified

6  immunity, the court must determine 'whether the facts that a plaintiff has alleged ... make out a

7  violation of a constitutional right,' and 'whether the right at issue was "clearly established" at the

8  time of defendant's alleged misconduct.' Id. at 816.  Whether a right is clearly established turns

9  on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were

10  clearly established at the time it was taken.' Id. at 822 (quoting Wilson v. Layne, 526 U.S. 603,

11  614, 119 S.Ct. 1692 [] (1999))." Clouthier v. County of Contra Costa, --- F.3d ----, 2010 WL

12  114958 (9th Cir. 2010).

13            Because the undersigned has recommended summary judgment on the merits of

14  plaintiff's claim, no reason exists to analyze the situation where a constitutional violation has

15  taken place, but reasonable officers would not have known about the clearly established law

16  protecting plaintiff.

17  VI.  CONCLUSION

18            For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants'

19  motion for summary judgment (Docket No. 48) be GRANTED.

20            These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten

22  (10) days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within seven (7) days after service of the objections.  The parties are

26  \\\\\

advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 17, 2010

_____/s/ Gregory G. Hollows_____

United States Magistrate Judge